**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| **PHYLLIS MOORE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No: 11 C 8931** |
| v. ) | |
| ) | **Magistrate Judge Jeffrey Cole** |
| **CAROLYN COLVIN,** ) | |
| **Acting Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM OPINION AND ORDER**

The plaintiff, Phyllis Moore, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act. 42 U.S.C. § 1382c(a)(3)(A). Ms. Moore asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

**I.
PROCEDURAL HISTORY**

Ms. Moore applied for DIB and SSI on February 6, 2009, alleging that she had become disabled on April 12, 2007. (Administrative Record ("R.") 169-74). Her application was denied initially and upon reconsideration. (R. 99-104, 106-109). Ms. Moore continued pursuit of her claim by filing a timely request for hearing. (R. 111).

An administrative law judge ("ALJ") convened a hearing on April 19, 2011, at which Ms. Moore, represented by counsel, appeared and testified. (R. 33-92). In addition, Grace Gianforte testified as a vocational expert. ®. 78-90). On May 16, 2011,

the ALJ issued a decision finding that Ms. Moore was not disabled because she retained the capacity to perform low-end, semi-skilled and unskilled sedentary work which existed in significant numbers in the national economy. ®. 12-21). This became the final decision of the Commissioner when the Appeals Council denied Ms. Moore' request for review of the decision on October 20, 2011. ®. 9-11). *See* 20 C.F.R. §§ 404.955; 404.981. Ms. Moore has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Ms. Moore was born on March 12, 1964, making her forty-three years old as of her alleged onset of disability. ®. 20). She has an associate's degree in communications. ®. 41). Most recently, Ms. Moore worked as a compliance officer for a securities company from 2004 to 2007. ®. 78). But her health problems mounted and she applied for, and was granted, long-term disability from her company. ®. 41-42). Those benefits expired in 2010. ®. 44).

### B.
### Medical Evidence

Ms. Moore has a host of medical problems and has sought and received a great deal of treatment. Consequently, the medical record in this case is a massive tome of over 1300 pages. A per usual, it is amassed in a jumble of documents, many illegible, in no particular order. But, the parties rely on just a small sampling of those documents to support their positions.

Ms. Moore was diagnosed with breast cancer in 1996. Because she tested positive for the BRCA-1 mutation, she decided to have a double mastectomy in 2003 as a preventative measure. (R. 714). She did not have a recurrence of the cancer, but the surgery was botched. Consequently, she was forced to undergo breast reconstruction surgery. When that did not alleviate the problem, Ms. Moore was subjected to repeated surgical repairs. (R. 942). Among these were a right breast capsulotomy in June 2009 (R. 940-41), additional reconstruction surgery on her left breast just three months later in September. (R. 943-944). More reconstructive surgery followed on a virtually regular basis: in December 2009 (R. 1250-1254), February 2010 (R. 1243-1246) and September 2010 (R. 1236-1238).

This wasn't the only misfortune Ms. Moore suffered at the hands of surgeons. In 2003, she was injured during a hysterectomy. She developed an incomplete transverse myelitis as a result of an error with a spinal tap. This lead to continuous problems with her back. (®. 48-49, 716). She had back pain all day, every day, despite taking medication. OxyContin only provided some relief. (R. 716). MRI testing in November 2007 revealed mild disc degeneration, facet osteoarthritis, and foraminal stenosis at various levels in plaintiff's lumbar spine from T12 through L5. In addition, there was a posterior annular tear with disc degeneration at L4-5. (AR 600-601) These findings led to the diagnosis by plaintiff's treating doctor, Dr. Joseph Beck, a pain specialist, of chronic lumbar pain. (R. 670). The doctor felt the pain was severe, and that it interfered with Ms. Moore's concentration, sleep, daily activities, and relationships with others. (R. 670). The effect on Ms. Moore's concentration was "marked"; it had a serious effect on her ability to focus. (R. 673).

In May 2006, Ms. Moore fell at a grocery store and injured her knee and experienced pain in her lower back. (R. 297) She subsequently had knee surgery, but continued to have significant pain thereafter. She underwent several steroid injections which provided temporary relief before wearing off. She also underwent physical therapy and tried a brace which also proved unsuccessful. (R. 407). An MRI showed edema and osteoarthritic changes, and indicated the presence of a prior patellar dislocation reduction type of injury and revealed a lateral tilt of the patella. (R. 501, 648-649, 770, 1129-1130) In August 2008, plaintiff had a left knee arthroscopy with patellar chondroplasty. ®. 418, 659). Her surgeon later remarked that she "may always have some patellofemoral pain secondary to chondomalacia as show on the arthroscopy." ®. 637). Another MRI in November 2009 showed fluid in her knee joint – more than would be expected with her condition – and thickening of the superior plica, suggestive of plica syndrome. (R. 1136).

The disability agency set up a consultative examination for Ms. Moore with Dr. Dominic Graziano in May 2009. The doctor noted that Ms. Moore walked with a left-sided limp, could not heel-toe or tandem walk, and had severe difficulty squatting. (R. 716). Grip strength was normal. (R. 716). Flexion in the lumbar spine was about half of normal – 50 degrees of 90. (R. 721). Right knee flexion was 110 degrees out of 150; left knee flexion was 90 degrees. (R. 722).

Ms. Moore also had a consultative examination with psychologist Patricia Morrin that same month. Ms. Moore's mood was downcast and severely depressed. (R. 730). She moved slowly, but her speech was relevant and coherent. (R. 730). Thought processes were intact. (R. 730). Judgment was impaired. (R. 729). Immediate memory

4

was somewhat impaired. (R. 728). Diagnosis was pain disorder associated with psychological factors and general medica condition. (R. 730).

In June 2009, Dr. Elizabeth Kuestner reviewed the psychological evidence on the agency's behalf. As a result of her psychological impairment, she thought Ms. Moore was mildly restricted in daily activities, moderately limited in social functioning and concentration, and had one or two episodes of decompensation. (R. 741). Dr. Maria Panepinto reviewed the record pertaining to Ms. Moore's physical impairments. She felt Ms. Moore could lift and carry 20 pounds occasionally and 10 pounds frequently, stand or walk 6 hours in an 8-hour day, and sit for 6 hours in an 8-hour day. (R. 750).

## C.
## The Administrative Hearing Testimony

### 1.
### The Plaintiff's Testimony

At the hearing, Ms. Moore testified that she stopped working due to chronic pain and depression. (R. 48). She explain that she had back pain as a result of a hysterectomy. (R. 48). She was on pain medication for the condition beginning in 2003, but it gradually got worse until, in 2007, she could no longer work. (R. 49). In addition to pain medication, she sought relief with epidural shots; she has had four or five. (R. 49). The pain also led to her becoming depressed. She saw a pain specialist and psychiatrist for this and had outpatient treatment. (R. 50, 51). She tried several medications for pain, but at the time of the hearing she was taking Cymbalta, Lyrica, Pazadene, and Tramadol. (R. 52). Previously, she had been taking Oxycontin, Oxycodone, and Xanax. (R. 52). She hadn't seen her doctor for a while because she no longer had insurance. (R. 52). She was able to get medication at a free clinic. (R. 53).

5

The medication only takes the edge off the pain for a while; it never completely relieves it. (R. 54).

Ms. Moore said her pain was a 9 or10 every day. It was lowest – perhaps 5 06 out 10 – when she was lying down. (R. 54-55). She spends much of the day lying down. She dozes off from time to time when she does. (R. 56). At night, Ms. Moore slept in two-hour increments before her pain would wake her up. (R. 68). She was unable to do any household chores. (R. 58). She can microwave food that has already been prepared. (R. 67). Her daughter helped her take baths. (R. 69). She watches televison and reads (R. 58), but her pain made it difficult for her to concentrate. (R. 70). She doesn't go to church; she doesn't leave the house. (R. 58-59). She doesn't drive. (R. 63). She doesn't do any lifting other than her purse, which she thought might weigh two pounds. (R. 59-60). Her doctor told her not to lift more than five pounds. (R. 60). Ms. Moore thought she could walk about five or ten minutes, and stand for about five or ten minutes. (R. 61). She became uncomfortable after sitting for about five or ten minutes. (R. 61).

Ms. Moore also testified that she had numbness and swelling in her hands and feet. She dropped things. (R. 62-63). She also had a knee impairment that caused pain and swelling. She had to keep her legs elevated on a daily basis. (R. 64).

## 2.
### The Vocational Expert's Testimony

Grace Gianforte then testified as a vocational expert ("VE"). She classified Ms. Moore's work as a compliance officer – or brokerage clerk – as sedentary and skilled. (R. 1001). The ALJ asked the VE consider the type of work available to an individual who could lift and carry twenty pounds occasionally and ten pounds frequently, stand or walk for four hours and sit for six hours in an eight-hour workday, could not maintain

6

intense focus for extended periods, could only stoop and crouch occasionally, could not frequently climb stairs, and could not work around heights or dangerous machinery. (R. 81-82). The VE thought that such a person would be limited to semi-skilled or unskilled sedentary work, but did not say whether she could perform Ms. Moore's past work. (R. 82). Examples of such jobs in the region were data examination clerk (1500 jobs), clerical sorter (1200 jobs), and document preparer (1500 jobs). (R. 82). These jobs demanded accuracy and attention to detail. (R. 87). They would not be compatible with a need to elevate the legs, trouble making repetitive movements with the hands, or a need to take more than three breaks per day. (R. ).

### D.
### The ALJ's Decision

The ALJ's decision is not a model of clarity. First, he found that Ms. Moore "engaged in substantial gainful activity since April 12, 2007, the alleged onset date." (R. 14). Yet, in the next paragraph, he noted that she had been receiving long-term disability payments through her employer's plan at that time, so "she was not actually performing [substantial gainful activity] after her alleged onset date." (R. 14). He then found that Ms. Moore suffered from the following severe impairments: "status-post mastectomy with breast implant, and multiple reconstruction and dysthmia." (R. 14). He noted there was no recurrence of cancer that would meet listing 13.00. He further noted that Ms. Moore's depression did not meet the listing for that impairment as she had only mild restrictions of daily activities and social functioning, moderate limitation on concentration, persistence, and pace, and no episodes of decompensation. (R. 15).

The ALJ next decided that, despite her impairments, Ms. Moore could perform "less than a full range of light work" which he then characterized as "essentially reduced

7

to sedentary work . . . and is in essence reduced to sedentary exertion" (R. 15). He stated that Ms. Moore's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Ms. Moore's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" her ability to perform sedentary work. (R. 16). The ALJ went on to find that Ms. Moore's complaints of disability based on her physical and psychological impairments were not supported by the objective evidence. (R. 16-18). Incredibly, he also found her testimony not credible based on her activities like watching TV and reading the newspaper, her sleep habits. (R. 19).

The ALJ went on to discuss the medical opinion evidence. He gave "generally [sic] weight" to the doctor who reviewed the file and found Ms. Moore could do light work. He also gave "only general weight" to the doctor who reviewed the psychological evidence. (R. 19). The ALJ gave little weight to Ms. Moore's treating physician, a pain expert, because his conclusions were not consistent with his treatment notes and the medical record as a whole. (R. 20). He then relied on the testimony of the VE to find that Ms. Moore could perform work that existed in significant numbers in the regional economy and was, therefore, not disabled under the Act. (R. 21).

## IV.
## DISCUSSION

### A.
### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind

might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

## B.
## The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.
## Analysis

At points, the ALJ's decision is a confusing read. For example, the ALJ said Ms. Moore engaged in substantial gainful activity since her onset date, but also said she hadn't. He said Ms. Moore could do light work, but also said she was limited to

10

sedentary work. The ALJ finds that Ms. Moore's only severe impairments – impairments that significantly limit her ability to do basic work activities, *Castile v. Astrue*, 617 F.3d 923, 826 (7th Cir. 2010) – are her depression and the residual effects of her cancer surgeries. Yet, the ALJ noted no restrictions as a result of the surgeries (R. 15, 17). Indeed, the restrictions he found reduced her capacity to sedentary work – limitations in lifting walking, standing, etc. – seemed to stem from her back and knee impairments, which the ALJ found were not severe. (R. 16-17). As the oddities in the opinion compound, it becomes a case of a "logical bridge too far."

One of the more troubling aspects of the ALJ's opinion is his finding as to Ms. Moor's psychological limitations in the context of the vocational evidence the VE provided. Among other things, the ALJ determined that Ms. Moore's depression left her with a moderate limitation in her ability to maintain concentration, persistence, and pace. In addition, she suffered from "moderate limitations in understanding, remembering and carrying [sic] detailed instructions; completing a normal workday and workweek without psychologically based interruptions due to problems with attention and concentration." (R. 19-20). From there, the ALJ reached the conclusion that Ms. Moore was "limited to performing no work requiring intense focus and concentration for extended periods; and performing 5% short of productivity goals in terms of quality and quantity." (R. 20). The ALJ did not mention any moderate limitations in concentration, dealing with detailed instructions, or completing a normal workday or workweek in his hypothetical to the VE. Instead, he asked the VE to consider an inability to "maintain intense focus for extended periods." (R. 81-82).

11

The Seventh Circuit has repeatedly stated that ALJs must provide vocational experts with a complete picture of a claimant's residual functional capacity, and vocational experts must consider "deficiencies of concentration, persistence, and pace." *Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011); *O'Connor–Spinner v. Astrue,* 627 F.3d 614, 619 (7th Cir. 2010); *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009). There is an exception in cases where the VE independently learned of such limitations by listening to the questioning at the hearing or reviewing the medical evidence, *O'Connor-Spinner*, 627 F.3d at 619; *Simila*, 573 F.3d at 521, but there is no indication of that in the record here. In fact, the VE did not join the proceedings until after Ms. Moore had completed her testimony about her restrictions. (R. 71). Here, the ALJ did not include his finding regarding Ms. Moore's moderate limitations in concentration, dealing with instructions, or completing workdays and workweeks in his hypothetical. An inability to maintain intense focus for extended periods does not capture those restrictions.

The Social Security Administration rates the degree of limitation in functional areas like concentration on a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). It provides no definition of these levels, other than to state the obvious, that "marked" is "more than moderate, but less than extreme." 20 CFR Pt. 404, Supt. P, App. 1, 12.00(C). A marked limitation is one that "seriously interferes with your ability to function independently, appropriately, effectively and on a sustained basis." 20 CFR Pt. 404, Supt. P, App. 1, 12.00(C). There's little to glean about what constitutes a moderate limitation from this other than it would be more than mild, but less than marked. Even so, it would seem that a moderate limitation in concentration,

dealing with instructions, and completing a normal workday or workweek would be more severe than merely an inability to "maintain intense focus for extended periods."

The line of cases from the Seventh Circuit on this area of disability law, while certainly not always easy to reconcile, *see Kusilek v. Barnhart*, 175 Fed.Appx. 68, 71 (7th Cir. 2006), does provide sufficient guidance to allow for a conclusion that this case must be remanded. The Seventh Circuit has held that, in certain situations, an ALJ can account for moderate limitations in areas like concentration by including a limitation to unskilled work, *Simila*, 573 F.3d at 522' or simple, repetitive work. *Sims v. Barnhart,* 309 F.3d 424, 431 (7th Cir.2002). In most cases, however, this is unacceptable. *Jelinek*, 662 F.3d at 814; *O'Connor-Spinner*, 627 F.3d at 620. The very specific exception to this rule – limitations to low-stress work where plaintiff's symptoms were stress or panic-related, a hypothetical that detailed the plaintiff's conditions that caused the limitations in concentration – do not apply here. *O'Connor-Spinner*, 627 F.3d at 619.

All this is to say that, if an ALJ is not allowed to account for moderate deficiencies in a functional area like concentration by limiting an individual to unskilled work in his hypothetical, he certainly may not do so by limiting an individual to work that does not involve intense focus for extended periods. According to the VE, this restriction – which certainly does not reflect a moderate limitation in concentration – allows for, not merely unskilled work, but *semi-skilled* work.

Moreover, the VE testified that the jobs she identified demand accuracy and attention to detail. How would a moderate restriction in the ability to concentrate or maintain focus allow a person to perform such work? Also left unexplained is how a person with a moderate restriction in the ability to complete a workday or a workweek be

13

able to perform work that was incompatible with a need to take more than three scheduled breaks a day or be absent more than 1 day a month. These, too, are the parameters of the work the VE identified for a person who could maintain *intense* focus for *extended* periods, as opposed to one who was moderately impaired in the areas of concentration and completing a workday and a workweek.

So, this matter must be remanded to the Commissioner for additional proceedings. Hence, it is worthwhile to address some other concerns, like the ALJ's assessment of Ms. Moore's credibility. The ALJ didn't believe Ms. Moore's complaints and, in saying so, employed the boilerplate language that is anathema to the Seventh Circuit, but which ALJs stubbornly insist on parroting – almost defiantly – in every opinion: the applicant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." ®. 16). *See Roddy v. Astrue*, 705 F.3d 631, 635-36 (7th Cir. 2013); *Filus v. Astrue,* 694 F.3d 863, 868 (7th Cir.2012); *Bjornson v. Astrue,* 671 F.3d 640, 644–45 (7th Cir.2012); *Parker v. Astrue,* 597 F.3d 920, 922 (7th Cir. 2010). The mere use of the boilerplate, however, does not contaminate a decision beyond redemption. If boilerplate were that toxic, no disability plaintiff's brief would ever be successful. Here, the ALJ otherwise explained his reasons for finding Ms. Moore not credible, so his incantation is harmless.[1]

---

[1] The "boilerplate argument" is becoming meaningless boilerplate itself, as disability plaintiff's attorney regularly pepper their briefs with it regardless of whether it is applicable. Counsel are reminded that an attorney violates Rule 11 when he or she presents an argument in a brief that has no reasonable basis in law or fact. Fed.R.Civ.P. 11(b); *Fabriko Acquisition Corp. v. Prokos,* 536 F.3d 605, 610 (7th Cir.2008). When an ALJ provides reasons for disbelieving a claimants testimony, plaintiff's counsel may argue that those reasons are invalid, but a "boilerplate argument" has no basis in fact.

14

The ALJ gave a few reasons for doubting Ms. Moore's veracity: the objective evidence did not support her allegations, her daily activities, and her sleep habits. Supporting a credibility determination by reference to the objective medical evidence is a dicey proposition in the Seventh Circuit. On the one hand, the appellate court has said that discrepancies between the objective evidence and self-reports may suggest symptom exaggeration. *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *Getch v. Astrue,* 539 F.3d 473, 483 (7th Cir. 2010). On the other, the Seventh Circuit has consistently held – taking its cue from the agency's own rulings – that a claimant's statements cannot be disregarded solely because they are not substantiated by objective medical evidence. SSR 96–7p,1996 WL 374186, at *1, *6 (July 2,1996); *Sawyer v. Colvin*, – F.3d –, –, 2013 WL 856509, *4 (7th Cir. 2013); *Villano v. Astrue,* 556 F.3d 558, 562 (7th Cir.2009); *Bjornson,* 671 F.3d at 646; *Myles v. Astrue,* 582 F.3d 672, 676–77 (7th Cir.2009).

The distinction seems to be between saying that a claimant's complaints are not at all credible and saying they are exaggerations. *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010). Here, the ALJ seemed to be saying that Ms. Moore's complaints were exaggerated as opposed to completely false, and that's acceptable. The problem might be in the ALJ's summary of the objective evidence. For example, he states that "contrary to [Ms. Moore's] statements" MRIs were normal. (R. 17). That's not entirely true as at least one MRI showed problems at a few vertebral levels along with an annular tear.

But, as already noted, that was just one leg of the ALJ's credibility analysis. He also said her daily activities belied her claims of excruciating pain. This is another area of credibility-finding law that is fraught with peril. Although it is appropriate for an ALJ

---

[1](...continued)

15

to consider a claimant's daily activities when evaluating their credibility, SSR 96–7p, at *3, this must be done with care. *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Roddy*, 705 F.3d at 639; *Bjornson,* 671 F.3d at 647; *Punzio v. Astrue,* 630 F.3d 704, 712 (7th Cir.2011); *Gentle v. Barnhart,* 430 F.3d 865, 867–68 (7th Cir.2005).

Here, the ALJ mentioned that, despite excruciating pain, Ms. Moore "was able to focus enough to watch television and read a newspaper, perform her own hygiene and 'clean a little spot in the bathroom.'" (R. 19). These are hardly significant daily activities. They certainly do not support the conclusion that a person would be able to work on a daily basis or, as the ALJ felt, that Ms. Moore was fabricating or exaggerating her claims of excruciating pain. If being able to walk two miles is not inconsistent with claims of severe pain, *Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004), Ms. Moore's minimal activities are surely not inconsistent with claims of severe pain. Reduced to its essentials, the ALJ's position is that anything beyond breathing and eating is inconsistent with a claim of debilitating pain. That's silly.

The ALJ also latched onto Ms. Moore's sleep habits. He said that "[s]he alleged that slept two hours a day but did not nap which meant she essentially did not sleep, a medical improbability outside of a rare sleep disorder." (R. 19). The problem here is that is not what Ms. Moore said. She said that at night, she slept "like maybe every two hours" or two hours at a time. (R. 56, 68). During the day, she would doze off for a few minutes here and there. (R. 56). The ALJ cannot mischaracterize a bit of testimony to

support his credibility determination. *Golembiewski v. Barnhart*, 322 F.3d 912, 016 (7th Cir. 2003).

There is also the matter of the ALJ's treatment of the opinion of Dr. Beck. The ALJ gave it little weight – as opposed to "general" weight or "generally" [sic] weight. When an ALJ rejects a treating source's opinion, he must provide good reasons for doing so. *Roddy v. Astrue*, 705 F.3d 631, 636 -637 (7th Cir. 2013); *Jelinek v. Astrue,* 662 F.3d 805, 811 (7th Cir.2011). Here, the ALJ said that the objective record and Dr. Beck's treatment notes were not consistent with the opinion. Those are valid reasons for discounting a treating doctor's assessment, *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008), but the ALJ did not indicate what notes and what other medical evidence he was looking at (R. 20), and it's not obvious from his opinion.

The ALJ referred to only one note of a mental status examination from Dr. Beck in his decision. (R. 18). While that note may have been positive, the very next day Ms. Moore saw Dr. Beck, "[s]he [was] extremely dysphoric. She has passive suicidal ideation." (R. 1047). People with chronic diseases, including depression, who are taking a pharmaceutical cocktail to control their condition are likely to have better days and worse days. *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). A hopeful snapshot of that person's condition on a given day doesn't mean they can hold down a job or undermine their doctor's assessment of their condition as disabling. *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

Finally, the ALJ is not particularly specific as to what undermines Dr. Beck's assessment of his patient. The consultative examiner found Ms. Moore's to be "downcast and severely depressed." (R. 730). The ALJ claimed that Dr. Morrin's testing revealed

17

intact judgment. Perhaps; but that doesn't mean Ms. Moore was not severely depressed. Moreover, the agency's own psychiatrist who reviewed Ms. Moore's case opined that she was mildly restricted in daily activities, moderately limited in social functioning and concentration, and had episodes of decompensation. (R. 741). This assessment, rather than scuttling Dr. Beck's opinion, very nearly mirrors it. (R. 20).

## V.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [#21] is GRANTED, and the Commissioner's motion for summary judgment [#25] is DENIED.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/19/13